**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| **JUSTIN LASTER,** | |
| *Plaintiff,* | |
| **v.** | **CIVIL ACTION NO.** |
| | **5:21-cv-00464-TES** |
| **GEORGIA DEPARTMENT OF** | |
| **CORRECTIONS,**[1] | |
| *Defendant.* | |

## ORDER GRANTING DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

Plaintiff Justin Laster filed this action on December 28, 2021, alleging that the

Georgia Department of Corrections ("GDOC") violated his rights under Title VII of the

Civil Rights Act of 1964, Titles I and II of the Americans with Disabilities Act, various

Georgia statutes, and the Fourteenth Amendment. [Doc. 1]. In response, GDOC and

Macon State Prison filed a Motion to Dismiss [Doc. 22], which the Court granted. In that

Order [Doc. 29], the Court dismissed all of Plaintiff's claims based on GDOC's

immunity under the Eleventh Amendment and Federal Rule of Civil Procedure

---

[1] In the Court's prior Order [Doc. 29], the Court held that "Macon State Prison is not a separate legal entity capable of being sued. Any claim lodged against Macon State Prison necessarily fails." [Doc. 29, p. 7 (first citing *Jamelson v. Unnamed Defendant*, No. 6:17-cv-103, 2017 WL 6503630, at *2 (S.D. Ga. Dec. 19, 2017), and then citing *Lawal v. Fowler*, 196 F. App'x 765 (11th Cir. 2006)).]. This portion of the Court's Order was not disturbed on appeal. *See generally* [Doc. 35]. Therefore, the Court **DIRECTS** the Clerk of Court to **TERMINATE** Macon State Prison as a party to this action.

12(b)(6). [Doc. 29]. Plaintiff appealed the Court's Order, and the Eleventh Circuit affirmed in part and reversed in part. The Eleventh Circuit affirmed the dismissal of Plaintiff's Title VII discrimination claim, as well as his claims under the ADA, Georgia law, and the Fourteenth Amendment. But, the Circuit reversed the Court's Order as it pertained to Plaintiff's Title VII retaliation claim and remanded that single claim for further proceedings. [Doc. 35, pp. 7, 9]; *Laster v. Ga. Dep't of Corr.*, No. 22-13390, 2023 WL 5927140, at *3 (11th Cir. Sept. 12, 2023).

Following discovery, GDOC filed the instant Motion for Summary Judgment [Doc. 46]. Plaintiff filed a Response [Doc. 49], which basically consisted of a regurgitation of the Eleventh Circuit's opinion in this case, with a few paragraphs copied from other cases. Plaintiff never engaged with GDOC's arguments or even attempted to explain why GDOC shouldn't prevail. *See generally* [Doc. 49].  Even more, Plaintiff did not include any evidence. [2] And, as the cherry on top, he outright failed to

---

[2] Plaintiff's Response states that he has "16+ witnesses" that he will call at trial, as well as "over 1,000+ evidentiary documents to support" his claims. [Doc. 49, p. 21]. But, as the Court instructed when it informed him of Defendant's motion, Plaintiff needed to supply that—or even *some*—evidence in his Response to GDOC's Motion. [Doc. 48 ("You are hereby notified that within 30 days from the date said motion was served upon you, you must file all materials, including any affidavits, depositions, answers to interrogatories, admissions on file, and any other relevant materials which you wish to be considered in opposition to the motion for summary judgment.")]. Once faced with a summary-judgment motion, Plaintiff shouldered the burden to establish, with admissible evidence, that a question of fact remained for the jury, and because he failed to even make a good-faith attempt to do so, the Court would be well within its discretion to grant summary judgment to GDOC based on the evidence (or lack thereof) to prove Plaintiff's case. *See United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am.*, 894 F.2d 1555, 1558 (11th Cir. 1990) ("If a review of the evidence presented reveals that the non-movant has failed to produce evidence sufficient to support a jury verdict in his favor, then summary judgment should be granted."); *see also Copeland v. Ga. Dep't of Corr.*, 97 F.4th 766, 782 (11th Cir. 2024) ("But he presented no evidence . . . [.] That failure is fatal because, faced with a motion for summary judgment, a party who fails to make a

respond to GDOC's Statement of Material Facts [Doc. 46-2]. So, before getting to the facts, the Court must discuss Local Rule 56's requirements because a failure to adhere to them can be detrimental (and often fatal) to a party's lawsuit.

## LOCAL RULE 56

Local Rule 56 clearly mandates that a party responding to a motion for summary judgment must respond to "each of the movant's numbered material facts." LR 56, MDGa. Further, it instructs that "[a]ll material facts contained in the movant's statement which are not specifically controverted by *specific citation to particular parts* of . . . the record shall be deemed to have been admitted, unless otherwise inappropriate." *Id*. (emphasis added). Local Rule 56 also preempts a nonmoving party's claim of insufficient knowledge unless the party has "complied with the provisions of Rule 56(d) of the Federal Rules of Civil Procedure." *Id*. Lastly, as an overarching principle, the Court does not consider "statements in the form of issues or legal conclusions." *Id*.

Local Rule 56 "isn't new, and it certainly isn't some recent requirement that the Court deviously sprung on [parties] in order to trick or trap them. No, Local Rule 56 is a longtime requirement with which all litigants must comply."[3] *Hall-Gordon v. Bibb Cnty. Sch. Dist.*, No. 5:21-cv-00143-TES, 2022 WL 3704917, at *1 (M.D. Ga. Aug. 27, 2022); *aff'd*

---

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, loses.").

[3] *See also Weil v. Neary*, 278 U.S. 160, 169 (1929) (holding that local rules have the "force of law").

*Gordon v. Bibb Cnty. Sch. Dist.*, No. 22-13286, 2023 WL 8253881, at *1–2 (11th Cir. Nov. 29, 2023). And, again, its purpose is clear: it "protects judicial resources by 'mak[ing] the parties organize the evidence rather than leaving the burden upon the district judge.'" *Reese v. Herbert*, 527 F.3d 1253, 1268 (11th Cir. 2008) (quoting *Alsina-Ortiz v. Laboy*, 400 F.3d 77, 80 (1st Cir. 2005)).

Although Plaintiff proceeds *pro se*, the Court informed him of the Local Rules, calling for special attention to Local Rule 56.[4] And a *pro se* litigant like Plaintiff is "bound by the local rules like any other litigant." *United States v. Rowls*, No. 20-13708, 2022 WL 577582, at *1 (11th Cir. Feb. 25, 2022). When a party violates Local Rule 56, the consequence is clear: the Court deems those asserted material facts that weren't properly controverted as admitted. *See Jones v. Gerwens*, 874 F.2d 1534, 1537 n.3 (11th Cir. 1989).

With the understanding that Plaintiff admitted all of GDOC's material facts, let's see how they shake out. *See Reese*, 527 F.3d at 1268 (noting that "[a]pplication of [a local rule] does not, however, automatically entitle the movant to summary judgment").

---

[4] *See* [Doc. 48 ("Local Rule 56 requires a motion for summary judgment to be accompanied by a separate document containing a short and concise statement of material facts in numbered paragraphs. Local Rule 56 also requires a party opposing a summary judgment motion to file a separate concise statement of material facts responding to the numbered paragraphs of the moving party's statement. The local rule further requires that the statements of material fact by both parties must include a reference to that part of the record that supports each statement.")].

## FACTUAL BACKGROUND[5]

Plaintiff began working at GDOC as a Correctional Officer in early July 2018. [Doc. 46-2, ¶ 1]. After completing training and certifications, GDOC assigned Plaintiff to Macon State Prison, specifically the H and J buildings, under the supervision of Lieutenant Mark Charles. [*Id.* at ¶¶ 3–4]. Since the H and J buildings were "isolation buildings," those posts were often more difficult than other buildings in the prison. [*Id.* at ¶¶ 4–5]. For example, officers in H and J buildings "did everything for" the inmates, including "providing them with meals, paperwork, forms, toothpaste, soap, [etc.]." [*Id.* at ¶ 5]. Moreover, officers in these isolation buildings must check on the inmates every 15 to 30 minutes by looking into the cell through a small flap in the door. [*Id.* at ¶ 6].

Before going too much further, a primer on some GDOC policies is in order. GDOC policy 205.10(VI)(A)(2) instructs that "each correctional officer will normally be rotated from one post to another at a minimum of once every 12 (twelve) months." [Doc. 46-4, p. 12]. The policy also states that "[t]he Chief Security Officer has the responsibility to manage the post rotation schedule and will approve all assignments and/or modifications made to the schedule." [*Id.*].

Now, back to Plaintiff. After a few months of working the isolation buildings, Plaintiff began to complain to Lt. Charles that the male officers weren't being rotated

---

[5] The Court reproduces a large portion of Plaintiff's deposition throughout this Order because Plaintiff's phrasing is often confusing and filled with double negatives. Instead of trying to paraphrase, the Court quotes, verbatim, many of Plaintiff's answers that will prove to be dispositive.

often enough, and that the male officers manned more "strenuous positions" than their female counterparts. [Doc. 46-2, ¶ 9]. Between January and May 2019, Plaintiff complained to Lt. Charles every few months, asking to be moved from the isolation buildings because he "need[ed] a break." [*Id.* at ¶ 11]. Lt. Charles allowed Plaintiff to work in other posts—like the kitchen and hospital—but Plaintiff wasn't happy with those short reprieves. [*Id.* at ¶ 12].

After exhausting his complaints with Lt. Charles, Plaintiff took his grievances to Warden Clinton Perry and Deputy Warden Sales. [*Id.* at ¶ 13]. Plaintiff did not file a complaint in writing, and he did not follow up with the Warden or Deputy Warden beyond this initial conversation. [*Id.* at ¶¶ 14–15].

On May 24, 2019, Plaintiff experienced an injury while carrying a full ice cooler up a set of stairs at the prison.[6] [*Id.* at ¶ 17]. Plaintiff's medical records (from weeks after the alleged incident) showed a diagnosis of a "chest strain," and Plaintiff received a doctor's note from his visit. [*Id.* at ¶ 18]. Plaintiff provided six to seven pages of his medical records to the prison's human resources office. [*Id.* at ¶ 25]. Plaintiff's medical notes only provided one reference to a "lift restriction," but otherwise, the doctors cleared Plaintiff to return to work with no impediments. [Doc. 46-4, p. 65 (a stock leaflet instructing Plaintiff to: "Follow these guidelines when caring for yourself at home: Rest.

---

[6] Importantly, Plaintiff testified that he stopped complaining about gender discrimination after his injury in May 2019. [Doc. 46-6, Laster Depo., p. 168:13–24].

Don't do any heavy lifting or strenuous activity. Don't do any activity that causes pain.")]; [*id.* at pp. 63–73]. Plaintiff also eventually filed a worker's compensation claim. [Doc. 46-4, pp. 37–38].[7]

Plaintiff and GDOC understood the medical records differently. Plaintiff testified that his records stated he "could not lift heavy objects," and that he provided those instructions to his supervisors. [Doc. 46-2, ¶ 26]. Plaintiff's concern centered around the understaffing at the prison, which could require him to help lift heavy objects since there were too few officers to do the work. [Doc. 45, Laster Depo., p. 149:17–22]. Plaintiff testified that after his injury, his assignments still required him to lift trays and coffee bins and carry those items up flights of stairs. [*Id.* at p. 150:6–12]. So, to remove himself from his perceived risk of harm, Plaintiff decided to "not go back to work because [he] would have injured [himself]." [*Id.* at p. 150:20–22].

Plaintiff did not show for his shifts on September 12, 16, 17, or 20, so GDOC issued a separation notice on September 23, informing Plaintiff that GDOC deemed him as "voluntarily resigned." [Doc. 46-2, ¶ 40]. In the end, Plaintiff claims that he faced retaliation because of his workers' compensation claim. [Doc. 45, Laster Depo., pp. 184:24—185:3 ("And I got it started, and that's when all this resigning and you're

---

[7] Plaintiff filed his workers' compensation claim on September 2, 2019—102 days after the alleged cooler incident. [Doc. 46-2, ¶ 32]. The State Board of Workers' Compensation denied Plaintiff's claim, concluding that "the preponderance of competent and credible evidence does not support [Plaintiff's] claim of injury." [Doc. 46-5, p. 5].

missing these days came up. So I told you, it was retaliatory action that happened time after I filed my claim, or was trying to file my claim for Workers' Compensation.")]; [*id.* at p. 218:18–21 ("But I don't know if that gender discrimination can add to the separation . . . that might not coincide together, I don't think, not that piece of it.")]; [Doc. 49, p. 7 ("The Georgia Department of Corrections in response of me filing a Worker's Compensation Claim retaliated against me by stating that I missed four (4) consecutive days of work[.]")].[8]

## LEGAL STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Cntys. in State of Ala.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *see also Anderson*, 477 U.S. at 248. "The moving party bears the initial

---

[8] Plaintiff's Amended Complaint did not clearly state the basis of GDOC's alleged retaliation. However, Plaintiff's deposition did. And, according to Plaintiff, he admits that Defendant retaliated against him because of his workers' compensation claim, not because he engaged in protected activity. Although the Court considers the possibility of Plaintiff maintaining a retaliation claim based on his gender complaints, he explicitly abandoned those claims by arguing that the retaliation resulted from his workers' compensation claim. The Court only analyzes these alternative arguments should a reviewing court later find Plaintiff properly preserved his claim.

responsibility of informing the court of the basis for its motion." *Four Parcels*, 941 F.2d at 1437. The movant may cite to particular parts of materials in the record, including, "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); Fed. R. Civ. P. 56(c)(1)(A).[9] "When the nonmoving party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material negating the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 323). Rather, "the moving party simply may show—that is, point out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 324) (cleaned up). Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.*

If this initial burden is satisfied, the burden then shifts to the nonmoving party, who must rebut the movant's showing "by producing . . . relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324). The nonmoving party does

---

[9] Courts may consider all materials in the record, not just those cited by the parties. Fed. R. Civ. P. 56(c)(3).

not satisfy its burden "if the rebuttal evidence 'is merely colorable or[] is not significantly probative' of a disputed fact." *Josendis*, 662 F.3d at 1315 (quoting *Anderson*, 477 U.S. at 249–50). "A mere scintilla of evidence supporting the [nonmoving] party's position will not suffice." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). And speculation is not enough to survive summary judgment, either. *McCreight v. AuburnBank*, No. 22-12577, 2024 WL 4232440, at *13 (11th Cir. Sept. 19, 2024).

Further, where a party fails to address another party's assertion of fact as required by Rule 56(c), the Court may consider the fact undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2). However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. *Anderson*, 477 U.S. at 255. Succinctly put,

> [s]ummary judgment is not a time for fact-finding; that task is reserved for trial. Rather, on summary judgment, the district court must accept as fact all allegations the [nonmoving] party makes, provided they are sufficiently supported by evidence of record. So[,] when competing narratives emerge on key events, courts are not at liberty to pick which side they think is more credible. Indeed, if "the only issue is one of credibility," the issue is factual, and a court cannot grant summary judgment.

*Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020) (internal citations omitted). Stated differently, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "The evidence of the [nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. And "if a reasonable

jury could make more than one inference from the facts, and one of those permissible inferences creates a genuine issue of material fact, a court cannot grant summary judgment"; it "must hold a trial to get to the bottom of the matter." *Sconiers*, 946 F.3d at 1263.

## **DISCUSSION**

Given the Court's prior Order, along with Plaintiff's Response [Doc. 49] and deposition, this case now condenses down to one issue: Did GDOC retaliate against Plaintiff in violation of Title VII? In short, no.[10]

To set the stage, this Order flows in two ways under each element of the prima facie case analysis: First, by evaluating Plaintiff's claims as he presents them (*i.e.*, that his workers' compensation claim led to his termination), and second, by analyzing Plaintiff's briefs and Amended Complaint under the most liberal of consideration, as required by the Eleventh Circuit's earlier opinion in this case (*i.e.*, addressing Plaintiff's implicit arguments regarding his work assignments and eventual termination as it

---

[10] The Court begins by dispelling Plaintiff's belief that the Eleventh Circuit instructed this Court to skip summary judgment and go straight to trial in this matter. *See, e.g.*, [Doc. 49, p. 21]. The Circuit did no such thing. Instead, the Circuit remanded Plaintiff's retaliation claim for further proceedings—which, in this case, meant discovery and dispositive motions. The Circuit's Opinion did not give Plaintiff a pass to skip normal proceedings and proceed directly to a jury. In other words, the Circuit's Opinion decided that at the motion-to-dismiss stage, Plaintiff had done enough to get the chance to develop and offer admissible evidence to support his case. And summary judgment provides that chance. At this stage in the case, Plaintiff needed to come forward with evidence to rebut GDOC's Motion. Plaintiff failed to carry that burden. *Josendis*, 662 F.3d at 1315 ("[Plaintiff] has failed to make a showing sufficient to survive summary judgment. In short, he has not satisfied his burden of coming forward with any admissible evidence beyond mere speculation to rebut [the defendant's] evidence[.]").

relates to his gender-based complaints.). *See Laster*, 2023 WL 5927140, at *3. In other

words, buckle up; this Order is quite dense.

## I.    Title VII Retaliation

To establish a prima facie case of retaliation under Title VII, a plaintiff "must

show that (1) [he] engaged in statutorily protected activity; (2) [he] suffered a materially

adverse employment action; and (3) there was a causal link between the two." *Dixon v.*

*The Hallmark Cos.*, 627 F.3d 849, 856 (11th Cir. 2010).

As it relates to the first prong, Title VII's anti-retaliation provision makes it "an

unlawful employment practice for an employer to discriminate against any of his

employees . . . [1] because he has opposed any practice made an unlawful employment

practice by this subchapter, or [2] because he has made a charge, testified, assisted, or

participated in any manner in an investigation, proceeding, or hearing under this

subchapter." 42 U.S.C. § 2000e-3(a). Importantly, the practice complained of must be

unlawful under Title VII. *Coutu v. Martin Cnty. Bd. of Cnty. Comm'rs*, 47 F.3d 1068, 1074

(11th Cir. 1995) ("Unfair treatment, absent discrimination based on . . . sex . . . is *not* an

unlawful employment practice under Title VII.").

The second element requires a plaintiff to show some sort of adverse

employment action that, in this context, "well might have dissuaded a reasonable

worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe*

*Ry. Co. v. White*, 548 U.S. 53, 68 (2006). For example, "undeserved negative job

evaluations, demotions, disadvantageous transfers, or toleration of harassment are actionable under the retaliation clause." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1283 (11th Cir. 1999); *cf. Muldrow v. City of St. Louis, Mo.*, 601 U.S. 346, 359 (2024) ("Although an employee must show some harm . . . to prevail in a Title VII suit, [he] need not show that the injury satisfies a significance test. Title VII's text nowhere establishes that high bar.").

And finally, for the third prong, a plaintiff must show that "had [he] not [engaged in the protected conduct], [he] would not have [faced adverse action]." *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1135 (11th Cir. 2020) (en banc) (citing *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018)). In *Gogel*, the Eleventh Circuit was clear: "it is the plaintiff's burden to provide evidence from which one could reasonably conclude that but for [his] alleged protected act, [his] employer would not have fired [him]." *Id.* at 1135.

If a plaintiff makes out a prima facie case of retaliation, the burden shifts to the employer to "proffer a legitimate, nonretaliatory reason for the adverse action." *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1307 (11th Cir. 2023) (internal citations omitted). If the employer does so, "the employee must prove that the employer's proffered reason was a pretext for retaliation." *Id.*

## II.    Plaintiff's Allegations

With the Title VII retaliation framework in mind, the Court analyzes each prong.

### A.    Protected Activity

First, Plaintiff must prove that he participated in protected activity. As best the Court can tell, Plaintiff could potentially take two avenues regarding any supposed protected activities: filing a workers' compensation claim and his overarching complaints of gender-based discrimination in his work assignments.

#### 1.    *Workers' Compensation Claim*

The Court begins with Plaintiff's implicit argument that he engaged in statutorily protected acitivity when he filed his workers' compensation claim. The scope of Title VII matters here. So, as a reminder, Title VII prohibits retaliation against a plaintiff "[1] because he has opposed any practice made an *unlawful employment practice by this subchapter*, or [2] because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing *under this subchapter*." 42 U.S.C. § 2000e-3(a) (emphasis added). In other words, Title VII forbids "an employer from retaliating against an employee for opposing conduct otherwise prohibited by those anti-discrimination statutes or aiding in the investigation or prosecution of discrimination claims." *Lanza v. Postmaster Gen. of U.S.*, 570 F. App'x 236, 240 (3d Cir. 2014). But Title VII only extends to claims based on "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(2).

Title VII does not include workers' compensation claims or other disability-type

claims. And courts across this circuit and the country have declined to extend Title VII's protected activities to include workers' compensation claims. *See* Order, *Carter v. Chappelle*, No. 4:24-cv-00052-RSB-CLR (S.D. Ga. Apr. 5, 2024), ECF No. 8 at 5 ("Filing a workers' compensation claim, under state law, does not appear to bear any relation to any practice made unlawful by Title VII."); *Lanza*, 570 F. App'x at 241 ("Filing a claim for workers' compensation does not constitute protected activity under either the Rehabilitation Act or Title VII."); *Reynolds v. Am. Nat. Red Cross*, 701 F.3d 143, 154 (4th Cir. 2012); *Jimenez v. Potter*, 211 F. App'x 289, 290 (5th Cir. 2006) ("[A] workers' compensation claim is not a protected activity under Title VII."); *Primm v. Dep't of Hum. Servs.*, No. 16-6837, 2017 WL 10646487, at *3 (6th Cir. Aug. 17, 2017) ("Primm's complaint alleges that she was discriminated against for filing a workers' compensation claim, but this is not a protected activity under Title VII."); *Giese v. City of Kankakee*, 71 F.4th 582, 590 (7th Cir. 2023); *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1093 (9th Cir. 2008); *Russell v. Strick Corp.*, No. CIV.A. 97-806, 1997 WL 381584, at *4 (E.D. Pa. July 9, 1997); *Nina Raspanti, Appellant*, EEOC DOC 01951398, 1996 WL 506203, at *3 (Aug. 29, 1996); *Bielek v. Allegheny Ludlum Corp.*, No. 2:04-CV-1910, 2006 WL 2773487, at *17 (W.D. Pa. Sept. 22, 2006); *McGee v. Bossier Par. Sch. Bd.*, No. CV 19-0106, 2019 WL 2621814, at *3 (W.D. La. June 26, 2019) ("Likewise, retaliation against an employee for filing a workers' compensation claim does not create liability under Title VII."); *Vega v. Century Concrete Inc.*, No. 6:21-CV-57, 2022 WL 3006390, at *5 (W.D. Va. July 28, 2022) ("The same logic

applies to the worker's compensation claim—the fact that Vega filed for worker's compensation has nothing to do with the protections of Title VII, so it cannot be the basis of a Title VII retaliation claim.").[11]

In the end, our law unmistakably shows that filing a workers' compensation claim is not considered protected activity under Title VII.[12] Therefore, any retaliation claims based on Plaintiff's workers' compensation activity fails as a matter of law.

### 2.    *Gender-Discrimination Complaints*

GDOC concedes that Plaintiff participated in protected activity in February 2019, by complaining to Warden Perry that "most men on the shift were not being rotated out of the tier shifts often enough." [Doc. 46-1, p. 8]. GDOC does not concede, though, that Plaintiff's other comments to supervisors rose to protected activity. Regardless, it only takes participating in one protected activity to bring Plaintiff under the protection of Title VII's antiretaliation provision. So, with the first prong satisfied, we press on.

### B.    Adverse Employment Action

Now that we have established that Plaintiff participated in at least one protected activity, the Court moves on to Plaintiff's alleged adverse employment actions. Along

---

[11] To the extent Plaintiff tried to argue that Defendant treated his medical situation differently based on his gender, he explicitly disavowed such a proposition. [Doc. 45, Laster Depo., p. 178:18–19 ("[T]he medical treatment wouldn't be nothing about male or female, you know.")].

[12] Assuming, *arguendo*, that the Court got it wrong, and Plaintiff did engage in protected activity when he filed a workers' compensation claim, it would make no difference in this case because, as discussed below, GDOC provides legitimate, nonretaliatory reasons for his termination that Plaintiff failed to show were pretextual.

with his termination, Plaintiff contends he suffered four other adverse employment actions: "(1) GDOC continued to assign him to the same difficult tier posts with only the occasional assignment to other posts; (2) GDOC continued to assign him to the tier buildings despite GDOC's notice of his injury; (3) GDOC constructively discharged him;[13] and (4) . . . denial of his worker's compensation claim."[14] [Doc. 46-1, pp. 8–9]. Again, for the sake of clarity, the Court splits these actions into two overarching categories: the termination, and a collective claim of retaliatory hostile work environment. *See Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 861 (11th Cir. 2020); *Williams v. Birmingham City Sch.*, No. 2:20-CV-2006-ACA, 2022 WL 4391505, at *4 (N.D. Ala. Sept. 22, 2022).

### 1.     Termination

Although GDOC takes issue with several of Plaintiff's alleged adverse employment actions, it concedes that it terminated Plaintiff. [Doc. 46-1, p. 8 ("[Plaintiff] fails to show any other adverse employment actions other than his termination.")]. Regardless of the other actions, termination suffices as an adverse employment action.

---

[13] Constructive discharge occurs when "an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job." *Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009). Plaintiff's claim of constructive discharge "fails as a matter of law because he did not resign; he was terminated." *Tobar v. Fed. Defs. Middle Dist. of Ga., Inc.*, 618 F. App'x 982, 987 (11th Cir. 2015).

[14] The Court makes quick work of Plaintiff's last argument. GDOC does not control the denial of workers' compensation claims—instead, in Georgia, that decision is left to the State Board of Workers' Compensation. *Synalloy Corp. v. Newton*, 326 S.E.2d 470, 471 (Ga. 1985). Therefore, denial of his workers' compensation claim cannot be an adverse employment action. *Cf. Smith v. Campbell*, 250 F.3d 1032, 1038 (6th Cir. 2001).

*Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 798 (11th Cir. 2000). And it only takes one adverse employment action to establish a prima facie case. *Jeter v. N.Y.C. Dep't of Educ. of City of N.Y.*, No. 06-CV-3687 NGG LB, 2012 WL 2885140, at *14 (E.D.N.Y. July 13, 2012). But, for the sake of thoroughness, the Court evaluates other potential adverse employment actions as well.

### 2.     *Retaliatory Hostile Work Environment*

As noted above, the Court combines Plaintiff's remaining alleged adverse actions into a single retaliatory hostile work environment claim. Under this type of claim, the primary question remains the same: Would GDOC's actions "dissuade[] a reasonable worker from making or supporting a charge of discrimination"? *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 64.[15] Again, short answer: No.

---

[15] It is true that on appeal in this case, the Eleventh Circuit held: "[W]e are not prepared to say that forcing an employee who has complained of discrimination and suffered an on-the-job injury to continue working a physically demanding assignment is such a 'petty and trivial action[ ]' that it can never form the basis of a Title VII retaliation claim." *Laster*, 2023 WL 5927140, at *3. This time is different for two reasons.

First, this case is no longer at the motion-to-dismiss stage, but is instead at the summary-judgment stage, where the burden is on Plaintiff to show a prima facie case of retaliation. *Cf. Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1325 (11th Cir. 2011). Second, the Court now has the benefit of Plaintiff's testimony that explicitly disclaims retaliation in response to his gender-discrimination complaints and instead insists that his retaliation claim is not related to the shift assignments. Specifically, when asked the cause of his alleged retaliation, Plaintiff unambiguously said "That they denied the Workers' Compensation when the evidence was clear." [Doc. 45, Laster Depo., p. 156:18–24]. Put another way,

> **Q**: How is what you described, these [adverse employment] actions that you described, how is that related to your complaints about discrimination?
>
> **A**: No, that, that issue is about the rotating shifts and the gender stuff, discrimination. That's not the same thing.

First, Plaintiff failed to prove that he suffered any harm at all following his complaints of gender discrimination. *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 67 ("The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces ***an injury or harm***.") (emphasis added); *cf. Muldrow v. City of St. Louis, Mo.*, 601 U.S. 346, 354 (2024) ("To make out a Title VII discrimination claim, a [plaintiff] must show *some harm* respecting an identifiable term or condition of employment.") (emphasis added). Indeed, Plaintiff testified that nothing changed at all:

> **Q**: I just want to make sure I understand. So before you complained and then after you complained nothing changed. Is that right?
>
> **A**: Right, it did not, no. Correct.

[Doc. 45, Laster Depo., p. 162:23—163:4]. To clarify, GDOC's counsel asked:

> **Q**: [W]hat was the retaliation after you complained about the [gender] discrimination from your lieutenants and the deputy wardens and everybody else?
>
> **A**: I don't think I said it was no retaliation in regards to that issue. Because I mean, that issue, I told you, see, they control the ball in that area. So you, you -- I mean how could someone – that's what I'm trying to say in that regard. How could someone retaliate against you if they're already winning?

[*Id.* at p. 162:3–17].[16]

---

[*id.* at pp. 160:23—161:4]; *see also* [*id.* at p. 161:19–20 ("The retaliation part is being denied legal medical care and compensation[.]")].

[16] GDOC paraphrased this as: "[Plaintiff] testified there, 'was no retaliation in regards to that issue. Because . . . that issue . . . they control the ball in that area. How could someone retaliate against you if they're already winning?'" [Doc. 46-2, ¶ 46]. Plaintiff admitted that was accurate. *See infra* n.19.

Retaliation "is a form of 'discrimination' because the complainant is subjected to *differential treatment*." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 168 (2005) (emphasis added). Put another way, Title VII's antiretaliation provision "refers to *distinctions* or *differences* in treatment that injure protected individuals." *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 60 (emphasis added). Since Plaintiff testified that GDOC treated him no differently after he complained to Warden Parry—as compared to the period before he complained to Warden Perry—he simply did not suffer an adverse employment action. *Cf. Masupha v. Mineta*, 551 F. Supp. 2d 730, 742 (N.D. Ill. 2008).

Even more, based on the evidence in the record, it appears GDOC and Plaintiff's supervisors tried to address Plaintiff's concerns. Namely, Lt. Charles—the supervisor that Plaintiff complained to about only being assigned tier/isolation posts—moved Plaintiff to other, easier assignments following their conversation. [Doc. 46-2, ¶ 12]; [Doc. 45, Laster Depo., p. 142:1–5; 11–23]; [*id.* at pp. 145:25—146:7]. If anything, this shows the opposite of adverse action—it shows that Plaintiff's supervisors listened to him and tried to improve his situation, not punish him for complaining.

Plaintiff also testified:

> From my perspective, my supervisor, he put me in [the harder posts] probably because that was something that they was already doing when he got in there, and he had been there, for the time he had been there they probably had been doing it like that, because that's, that's how I -- I guess he done saw that and felt that when I got in there[.]

[Doc. 45, Laster Depo., pp. 86:21—87:3]. If Plaintiff admits that his supervisor made

these assignments based on common or historical practice, there can be no retaliatory motive. *Clemmons v. Columbus Consol. Gov't*, No. 4:15-CV-54 (CDL), 2016 WL 6892086, at *6 (M.D. Ga. Nov. 22, 2016); *Jackson*, 544 U.S. at 168 ("Retaliation is, by definition, an intentional act."); *see also Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997) ("Title VII's protection against retaliation does not permit EEO complainants to disregard work rules or job requirements.").[17] Accordingly, Plaintiff failed to prove that GDOC created a retaliatory hostile work environment because he complained about his assignments.

So, to review, Plaintiff participated in protected activity by complaining to the Warden that the prison failed to rotate him from the tougher posts because he was a man, and he suffered an adverse employment action in his termination. Plaintiff did not establish a claim for retaliatory hostile work environment, but, assuming *arguendo*, a reviewing court sees things differently, the Court still analyzes the remaining elements as if he did establish such an adverse action.

### C.      Causal Connection

To establish the necessary causation, a plaintiff must demonstrate that "[his] protected activity was a but-for cause of the alleged adverse action by the employer."

---

[17] The Court also found that these same work assignments were not a basis for a discrimination claim because "more difficult work assignments do not generally constitute discrimination in violation of Title VII." [Doc. 29, p. 10 (citing *White v. Hall*, 389 F. App'x 956 (11th Cir. 2010))].

*Univ. of Tx. Sw. Med. Ctr v. Nassar*, 570 U.S. 338, 362 (2013).[18] "The but-for standard asks whether a particular outcome would not have happened 'but for' the purported cause." *Yelling*, 82 F.4th at 1338 (internal citations omitted). Put another way, "a plaintiff must prove that had [he] not complained, [he] would not have been fired." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018).

At the outset, Plaintiff's causation element suffers from a fatal flaw: He is unable to point to any specific individual who retaliated against him. In his words,

> **Q**: So you're, you're saying you're not really sure who at the GDOC retaliated against you. Is that right?

> **A**: Well I don't know the persons that did tell that information to try to keep from getting that Workmen's Compensation claim approved[.]

[Doc. 45 Laster Depo., p. 158:19–24]. Without that information, Plaintiff cannot make out a prima facie case. *Hatcher v. Precoat Metals*, 812 F. Supp. 2d 1287, 1294 (N.D. Ala. 2011); *cf. Zevallos v. Allison*, No. 2:18-CV-1111 AC P, 2021 WL 2003039, at *2 (E.D. Cal. May 19, 2021) ("Plaintiff's retaliation claim fails because he has not identified who retaliated against him.").

Regardless, the Court presses on to the specific analyses of causation for each potential adverse employment action.

---

[18] "Though available for Title VII discrimination claims, it is well-established that the mixed-motive framework does not apply to Title VII retaliation claims." *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1338 (11th Cir. 2023).

1.    *Termination*

First, as to Plaintiff's termination, his own deposition points to different reasons for GDOC's decision. Plaintiff clearly and unequivocally stated that he believed his workers' compensation claim formed the basis of GDOC's retaliation and his termination.[19] For proof of that, let's look at Plaintiff's own words:

- And I got it started, and that's when all this resigning and you're missing these days came up. So I told you, it was retaliatory action that happened time after I filed my claim, or was trying to file my claim for Workers' Compensation. [Doc. 45, Laster Depo., pp. 184:24—185:3];

- But I don't know if that gender discrimination can add to the separation . . . that might not coincide together, I don't think, not that piece of it. [*id.* at p. 218:18–21];

- But when they sent me that paper and then I disputed it, the retaliatory action started to come when I had to deal with the prison, I had to deal with the staff, especially the administrative staff, with trying to get Workers' Compensation. [*id.* at p. 154:12–16];

- **Q**: So I guess I'm trying to understand what the, what you believe the retaliation is. Is it that they denied you the Workers' Compensation claim? What, what exactly was the retaliation?

  **A**: That they denied the Workers' Compensation when the evidence was clear. [*id.* at p. 156:18–23].

Plaintiff reaffirmed this position in his Response, too: "The Georgia Department of Corrections in response of me filing a Worker's Compensation Claim retaliated against

---

[19] GDOC's Statement of Material Facts also state that Plaintiff "believes that his termination was in retaliation for the filing of his worker's compensation claim." [Doc. 46-2, ¶ 48]. And, if you'll recall, Plaintiff admitted these facts by not following Local Rule 56.

me by stating that I missed four (4) consecutive days of work[.]" [Doc. 49, p. 7].

Plaintiff further explained that his complaints of gender discrimination were distinct from his retaliation claim:

> It, it -- you look at it, it's on different issues. So you have that gender one that had something to do with your direct supervisors, had something to do with the warden, deputy warden, because they knew that this was not fair to you, being a male. And women were getting way better treatment you were, probably exceptional treatment. So that's the gender discrimination part. The retaliation part is being denied legal medical care and compensation so you could return to work.

[Doc. 45, Laster Depo., p. 161:10–21)].

Plaintiff did testify that his claims of gender discrimination were "tied" to his eventual separation. [Doc. 45, Laster Depo., p. 216:7]. But again, he claims that his gender discrimination complaints "ties" in because:

> You complaining about that you're not getting treated right, and you don't have the necessary manpower or woman power or whatever you want to call it, or bodies to do the work. Then you get injured because you don't have the bodies, right. So you don't have the bodies that are needed. Now something does go wrong, right. This is something you dread not to happen. The way I see it is that the department did not want this to be the hill they fell on. In other words they wanted this to be kind of like gone away without any kind of consequence or having to say that yeah, because we didn't have the people, you know, this probably occurred because you didn't have no help there to do it, and wasn't nobody else to assist in there that should have been there. And see, that [*sic*] what I'm saying. That tie directly to trying to not be held liable for that. That's why you would try to fight about that or not want to pay, thinking that it could be just swept away. Maybe they'll just give up and stop fighting about that.

[*Id.* at pp. 216:9—217:8].

Taking all this together, and discarding the mere speculation, it is nearly

impossible to conclude that Plaintiff's complaints about gender disparities in work assignments led to GDOC's decision to terminate him. *McCreight*, 2024 WL 4232440, at *1. Or, to be more precise, that Plaintiff's complaints were the "but-for" cause of his termination. But it gets worse. When asked how his "complaint about staffing issues with women getting less strenuous jobs" related to his separation, Plaintiff backtracked and said:

> The way I can see it is like I said, when you done complained about the women not having the strenuous post, that might not be so connected to that piece maybe. It's just the other piece of not having necessary bodies there to do it would put you at that risk. But I don't know if that gender discrimination can add to the separation. I don't think that might not coincide together, I don't think, not that piece of it.

[*Id.* at p. 218:8–21]. In the end, even Plaintiff isn't convinced that his complaints of gender discrimination *caused* his termination. When asked if his termination related to his gender-discrimination complaints, Plaintiff summed it up: "I can't say one way or the other did they get mad about . . . those conversations . . . that I wanted to be rotated[.]" [Doc. 45, Laster Depo., p. 177:6–9]. This sort of equivocal, shifty testimony cannot be properly considered "evidence" that suffices to salvage Plaintiff's retaliation claim.[20]

But, there's more. Plaintiff's gender-based complaints occurred between January and May 2019, but his termination did not occur until September 2019. This matters for

---

[20] Once again, Plaintiff clearly admitted—via GDOC's Statement of Material Facts—that "his complaints about gender discrimination were not connected to his termination." [Doc. 46-2, ¶ 49].

two reasons.

First, Plaintiff complained to Lt. Charles in early 2019. But, by September 2019, Lt. Charles no longer supervised Plaintiff—instead, Lt. Jerry Jefferson assumed that role. [Doc. 46-2, ¶ 23]. And Lt. Jefferson is the supervisor that reported Plaintiff's absences. [*Id.* at ¶ 36]. Lt. Jefferson is also the person that Plaintiff suspects made the decision to terminate him. [Doc. 45, Laster Depo., p. 181:2–13]; [*id.* at p. 188:7–10].[21] Plaintiff never complained about gender-based discrimination to Lt. Jefferson. [*Id.* at ¶ 23]. And a decisionmaker cannot retaliate based on information he does not possess. *Brungart*, 231 F.3d at 799; *see also McCreight*, 2024 WL 4232440, at *1 ("And because both women failed to offer evidence, rather than speculation, that their supervisors knew about their age or sex discrimination complaints, their retaliation claims also fail.").

Second, the timing is important because Plaintiff cannot rely on temporal proximity to infer causation. To invoke causation via temporal proximity, a plaintiff must show "close temporal proximity between the protected conduct and an adverse employment action." *Hulbert v. St. Mary's Heath Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006). The temporal proximity must be "very close" to satisfy the causation requirement. *Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1272 (11th Cir.

---

[21] Plaintiff also explicitly states that Lt. Charles took no part in his termination. [Doc. 45, Laster Depo., p. 181:10–14 ("Lieutenant Charles, I know he wasn't directly involved in [the termination] then because he wasn't there, not on this post. He had done went, like I said, to Human Resources, and he was a lieutenant over there.")].

2017). Indeed, the Eleventh Circuit clearly instructs that "[a] three to four month disparity between the statutorily protected expression and the adverse employment action is not enough." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). That is exactly the case for Plaintiff. He last complained of gender-based discrimination in May—but was terminated in September. That is too long for purposes of temporal proximity.[22]

In the end, Plaintiff did not prove causation between any ***protected***[23] activity and his termination.

### 2.    *Retaliatory Hostile Work Environment*

As to the retaliatory hostile work environment claim, even if the Court got it wrong and Plaintiff sufficiently proved that GDOC created such an environment based on his complaints, Plaintiff still fails to show any causation between his protected activity and an alleged hostile work environment.

For starters, the Supreme Court clearly held that employers are not required to upend previously planned work assignments or transfers simply because an employee participated in protected activity. *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272

---

[22] Even more, an "[i]ntervening act[] of misconduct"—like not showing up for work—"can break any causal link between the protected conduct and the adverse employment action." *Henderson v. FedEx Express*, 442 F. App'x 502, 506 (11th Cir. 2011).

[23] Again, filing a workers' compensation claim is not protected activity under Title VII. Therefore, even if Plaintiff were fired for filing such a claim (an assertion he only speculates about) it would not be unlawful under Title VII.

(2001). And Plaintiff does not allege that he was singled out to receive harder assignments because of his alleged protected activity. In essence, he claims "retaliation for being treated like (most) everyone else." *Dabney v. Hughes Hubbard & Reed LLP*, No. 1:23-MC-78 (MKV), 2023 WL 4399048, at *8 (S.D.N.Y. July 6, 2023).

Finally, and even more detrimental to this alleged adverse action, as explained above, Plaintiff's supervisor changed between his complaints and when he returned to work after being injured. Plaintiff complained to Lt. Charles, but after his injury, Lt. Jefferson controlled his post assignments. [Doc. 46-2, ¶ 12]; [Doc. 45, Laster Depo., p. 149:5–16]. And Plaintiff never complained to Lt. Jefferson. [Doc. 46-2, ¶ 23]; [Doc. 45, Laster Depo., p. 166:8–10 ("**Q**: Did you ever complaint to [Lt. Jefferson] as well? **A**: No.")]. It is axiomatic that a supervisor without knowledge of a prior complaint cannot retaliate against an employee. *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997); *Johnson v. Publix Super Mkts., Inc.*, No. 404CV394-RH/WCS, 2005 WL 1876164, at *3 (N.D. Fla. Aug. 8, 2005) ("A manager who is unaware of an employee's protected conduct obviously cannot retaliate against the employee based on that conduct."). So, any retaliation based on work assignments necessarily fail.

### D.    Legitimate, Nonretaliatory Reasons

Again, assuming the Court has completely whiffed on every issue so far, and Plaintiff did establish a prima facie case of retaliation, the burden passes to GDOC "to articulat[e] a legitimate, [nonretaliatory] reason for the employment action." *Gogel*, 967

F.3d at 1135. At this stage, GDOC's burden is "exceedingly light," and is one of "production, not persuasion." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 769 (11th Cir. 2005). "[T]his burden involves no credibility determination[.]" *Id.* To carry its burden, GDOC must only produce "a clear and reasonably specific [non-retaliatory] basis" for its actions. *Id.* at 770.

### 1.    Termination

GDOC offers a simple reason for Plaintiff's termination: "[H]e missed multiple days of work without calling to notify his supervisor that he would be out." [Doc. 46-1, p. 17]. Indeed, the evidence shows that Plaintiff missed four consecutive days without alerting GDOC of any medical reason. [Doc. 46-4, p. 45]; [Doc. 46-4, p. 59]; [Doc. 46-4, p. 60]; [Doc. 46-4, p. 61]. Plaintiff doesn't dispute that he missed work on these days, either. [Doc. 45-6, p. 1]; [Doc. 45, Laster Depo., p. 183:24—184:6]. GDOC's explanation that it terminated Plaintiff for unexcused absences from his job is a legitimate, nonretaliatory reason. *Anderson v. JPMorgan Chase & Co.*, 418 F. App'x 881, 884 (11th Cir. 2011); *Agee v. Mercedes-Benz U.S. Int'l, Inc.*, 646 F. App'x 870, 876 (11th Cir. 2016).

### 2.    Retaliatory Hostile Work Environment

As for Plaintiff's arguments that GDOC continued to place him in harder posts, he admits (and seems to agree) that GDOC had a legitimate basis for assigning him there. [Doc. 45, Laster Depo., p. 119:1–11 ("Well I think that was about it, that they couldn't accommodate [assignment changes] because they didn't have enough men at

the time. And like I said, they said, [u]ntil we get some more men we can't really move

you to anywhere else that we can, you know, have you in another post or whatever.

And I had the understanding of that.")].

Plaintiff also explained that he understood why women weren't placed in the

isolation units as often. As he put it:

> You didn't want to make [the female officers] feel overwhelmed for being
> over somewhere, because they worry about being flashed, being shown the
> guys' privates and stuff, because they did that with women. And I think
> that was the problem. They did not like that at all, the women did not like
> no inmates flashing. So they, they just expressed themselves fully when that
> happened to them, you know. And I understood where they were coming
> from really. But they didn't mostly do it to a guy.

[*Id.* at pp. 84:18—85:3].

### E.    Pretext

Since GDOC offered a legitimate, nonretaliatory reason for Plaintiff's

termination, the burden shifts back to Plaintiff to show that the proffered reason was in

fact a pretext for retaliatory conduct. *Gogel*, 967 F.3d at 1135. Importantly, "a reason is

not pretext for [retaliation] unless it is shown *both* that the reason was false, *and* that

[retaliation] was the real reason." *Gogel*, 967 F.3d at 1136 (citing *Springer v. Convergys

Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007)).

#### 1.    Termination

Plaintiff doesn't clearly argue pretext,[24] but instead offers explanation or reasons

---

[24] To be sure, it is Plaintiff's "ultimate burden of proving . . . that the reason provided by the employer is a

why he missed work. Namely, Plaintiff argues that he didn't have to call in sick or let his employer know that he wouldn't show for his shift because in his mind, GDOC should have known he wasn't coming to work based on his workers' compensation claim, and that he needed to remove himself from the unsafe working conditions. [Doc. 45, Laster Depo., p. 185:4–25].

First, GDOC policies require employees to notify their supervisors of medically necessary absences. [Doc. 46-4, pp. 22–34]. And, Plaintiff acknowledges that GDOC "asked for documentation when you could not come to work." [Doc. 45, Laster Depo., pp. 32:25—33:1]. Plaintiff's medical documents did not state that he needed to be excused from work—aside from the immediate 24 to 48 hours following some visits. [Doc. 46-4, pp. 63–73]. But, even those medical notes that provided a work excuse for up to two days all came before the relevant dates when Plaintiff no-call, no-showed. [*Id.*]. In the end, nothing in the record shows that GDOC "should have known" that Plaintiff wasn't coming to work because of his injury. Rather, the evidence shows the opposite.

Komola Edwards—GDOC's Human Resources Director—stated that "nothing in [Plaintiff's] personnel file indicated that he would be out for an extended period of time covering the dates in September for which he failed to show up to work." [Doc. 46-4,

---

pretext for prohibited retaliatory conduct." *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008). Because Plaintiff failed to offer any evidence of pretext—and more broadly, any evidence *at all*— summary judgment for GDOC is appropriate. *Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276, 1291 (11th Cir. 2005); *Chavez v. Credit Nation Auto Sales, LLC*, 641 F. App'x 883, 886 (11th Cir. 2016) ("If the plaintiff does not proffer sufficient evidence to create a genuine issue of fact as to pretext, the defendant employer is entitled to summary judgment.").

Edwards Aff., ¶ 9]. And, Edwards clarified that Plaintiff's medical records did not list restrictions, and "none of the letters state that he needs to miss more than one day of work." [*Id.* at ¶ 13]. Edwards concluded that "there was no reason to think that [Plaintiff] required any work restrictions" based on his medical records. [*Id.* at ¶ 14].[25]

Even if Plaintiff couldn't perform certain tasks, he doesn't get to just skip showing up at all. Indeed, Georgia law explicitly contemplates individuals who refuse to perform suitable work while injured. O.C.G.A. § 34-9-240. Therefore, it is illogical to assume that filing a workers' compensation claim (after you've refused to show up to work) suddenly becomes a blanket work excuse. *Cf. Key v. Cent. Ga. Kidney Specialists, P.C.*, No. 5:19-CV-00253-TES, 2020 WL 7053293, at *8 (M.D. Ga. Oct. 28, 2020), *aff'd* No. 20-14351, 2021 WL 5321892 (11th Cir. Nov. 16, 2021).

2.    *Retaliatory Hostile Work Environment*

As to his continued-work assignments, Plaintiff again does not argue pretext. But, as discussed above, *see supra* Section II.B.2, GDOC tried to help make Plaintiff's plight better. Plaintiff's supervisors gave him easier assignments following his complaints. [Doc. 46-2, ¶ 12]; [Doc. 45, Laster Depo., p. 142:1–5; 11–23]; [*id.* at pp. 145:25—146:7]. While he did not maintain the cushiest assignments permanently, those reprieves show GDOC's efforts to make his situation better—not worse. And that

---

[25] GDOC's Equal Employment Opportunity Commission position statement also states that Plaintiff "did not ask for accommodations," and he was not placed on a transitional plan because he "had no restrictions listed on any of his return-to-work documents." [Doc. 46-4, p. 42].

counsels against a finding of pre-text.[26]

Even if Plaintiff did construct a prima facie case of retaliation, he failed to carry his burden of showing that GDOC's proffered reasons were pretextual and that retaliation truly motivated the actions.[27]

## <u>CONCLUSION</u>

Although the "well might have dissuaded standard" for retaliation claims "is contextual,"[28] and "generally a question of fact for a jury,"[29] that does not relieve Plaintiff of his burden to "introduce[e] evidence that could form the basis for a finding of facts, which when taken in the light most favorable to [him], could allow a jury to find . . . that the action taken was in retaliation for engaging in the protected activity." *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 921 (11th Cir. 1993). Plaintiff produced no

---

[26] Additionally, as discussed earlier, Plaintiff expressed his understanding of why men—like him—were placed in the isolation posts as opposed to women. It's hard to argue pretext when he agrees with (or at least acknowledges) GDOC's reasons for placing him in those assignments.

[27] Although Plaintiff does not raise the argument, for the same reasons outlined above, the Court is not convinced that Plaintiff produced a "convincing mosaic" of retaliation. *See Berry*, 84 F.4th at 1310 ("Without relying on the *McDonnell Douglas* framework, an employee may prove retaliation with any circumstantial evidence that creates a reasonable inference of retaliatory intent. Some of our precedents refer to this evidentiary approach as the 'convincing-mosaic framework.'"). Under the convincing-mosaic framework for retaliation, the question is essentially the same as outlined throughout this Order: "[W]hether the evidence permits a reasonable factfinder to find that the employer retaliated against the employee[?]" *Id.* Even under a convincing-mosaic theory, the burden is on Plaintiff to "present a story, *supported by evidence*, that would allow a reasonable jury to find that the employer engaged in unlawful retaliation against the employee." *Id.* at 1311. (emphasis added). Here, Plaintiff failed to present any evidence. Still, viewing the entire record in Plaintiff's favor, there is no convincing mosaic of retaliation.

[28] *Monaghan*, 955 F.3d at 862.

[29] *Laster*, 2023 WL 5927140, at * 3.

evidence. None. And, upon review of GDOC's evidence and the applicable law, the

Court **GRANTS** GDOC's Motion for Summary Judgment [Doc. 46]. The Clerk of Court

is **DIRECTED** to **ENTER** Judgment and **CLOSE** this case.

      **SO ORDERED**, this 24th day of September, 2024.

*S/ Tilman E. Self, III*
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**